UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ISHAN MALIK,

                      Plaintiff,         Case No. 22-cv-3187

       -against-                **COMPLAINT**

BUSINESS INSIDER, INC.,            Plaintiff demands trial by jury
ALEX MORELL, and                of all issues so triable.
JOHN DOES 1-5,

                      Defendants.
------------------------------------------------------------------x

Plaintiff ISHAN MALIK, by his attorneys, Law Office of Richard A. Altman, for his complaint against defendants, alleges as follows:

## INTRODUCTION; THE PARTIES

1. This is an action for defamation and injurious falsehood, arising from an online article ("the Article") written and published by the defendants. The Article is of and concerning the plaintiff, a non-public figure, who is by profession a securities trader.

2. The defendants' writing and publication of the Article was based on false statements from anonymous sources, despite defendants' knowledge that its central assertions were false.

3. The publication and continued availability of the Article has directly caused plaintiff to suffer serious damage to his previously excellent reputation, and has rendered him unable to find permanent employment in his profession. He has, to all intents and purposes,

been effectively banned from the securities industry despite a spotless record of integrity and results.

4. Plaintiff is a resident of the State of Connecticut.

5. He was employed by J.P. Morgan Chase ("JPMorgan") from June 2019 until September 3, 2021.

6. Defendant Business Insider, Inc. ("BI") is, on information and belief, a Delaware corporation authorized to do business in New York, with a principal place of business at 1 Liberty Plaza, 8th Floor, New York, NY 10006. It publishes a newsletter of the same name, at www.businessinsider.com.

7. Defendant Alex Morell is, on information and belief, a resident of New York, and is a journalist and writer.

8. Defendants John Does 1-5 are persons whose identities are presently unknown to plaintiff, and who were the anonymous sources for the Article which is the basis of this action.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(2), in that it is between citizens of different States, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

10.  Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district, in that a substantial part of the events giving rise to the claims occurred in this district, and that the defendants are subject to personal jurisdiction in this district.

## THE ARTICLE

11.  On or about July 9, 2021, defendant BI published the Article on its website, credited to defendant Alex Morell as the writer. It remains on the website to the present day: https://www.businessinsider.com/jpmorgan-derivatives-trader-exits-following-late-night-tweets-2021-7?op=1.

12.  The Article states in full as follows (bold in original):

> **A hot-headed VIX trader is out at JPMorgan. A series of late-night tweets may have been the breaking point.**
>
> **•JPMorgan is letting go a trader on one of Wall Street's hottest desks.**
>
> **•Ishan Malik, an executive director who traded VIX, departed the firm this week, sources said.**
>
> **•A series of late-night tweets connected to Malik contributed to his exit, one person said.**
>
> A JPMorgan trader on one of the hottest desks on Wall Street is out. The departure comes on the heels of the firm learning of a series of late-night tweets over the July 4th holiday weekend that were connected to the trader, two sources familiar with the matter told Insider.
>
> Ishan Malik, a 33-year-old executive director who traded the CBOE Volatility Index for the bank's US equity derivatives desk, is being let go from the firm, the sources told Insider.
>
> At JPMorgan as well as previous employers, Malik accumulated a track record of abrasive and hot-headed behavior that alienated people he worked with,

-3-

three sources familiar with the behavior said. He was known to yell at others on the trading floor and berate brokers, the sources said, and his demeanor evoked a bygone era of hyper-aggressive Wall Street trading floors and clashed with the modern-day professional standards where decorum and relationship building are prized.

JPMorgan officials became aware of a series of tweets sent in the wee hours Saturday that they came to believe were authored by Malik, and they contributed to his exit from the firm this week, a source familiar with the matter told Insider.

Insider was unable to directly review the tweets. Sources described the tweets, sent around 2 a.m. and deleted later that day, as "venting" and off color, and said that in one instance they referenced a public trade. The tweets did not reveal non-public information.

A JPMorgan spokeswoman declined to comment. When reached by phone Thursday, Malik declined to comment. Reached later by text, he disputed the information and characterization in this story but declined to comment further.

The company's code of conduct from bank's website says employees "must use good judgment when making personal statements in public, including on your personal social media accounts."

It further states that employees "may not opine on or provide information relating to our Firm's business or your role or job responsibilities in a public forum unless you are specifically authorized to do so" and that "comments should not have an adverse impact on our Firm."

Sources told Insider that violating the code of conduct would not automatically lead to dismissal and that infractions are handled on a case-by-case basis and take into account additional context, such as an employee's history at the firm.

Malik joined JPMorgan as a VIX trader in 2019 after nearly three years at BNP Paribas. Before that he worked at Thiel Capital and Wells Fargo, according to his Linkedin profile.

His exit is notable in part because JPMorgan is the top equities shop on the Street– it led all banks with $13 billion in 2020 revenues–and its US equity

> derivatives team has to this point escaped the talent war for volatility traders comparatively unscathed.
>
> Equity derivatives has been one of the hottest trading areas across Wall Street over the past year, and after a record run for many bank volatility traders in 2020, buy-side investment firms have aggressively hired from sell-side shops including Citigroup, Goldman Sachs, and Morgan Stanley, contributing to an inter-bank game of musical chairs.
>
> Spencer Cross, an executive director who left JPMorgan in May to run US index trading at Bank of America, is the only veteran trader hired away from the firm's US equity derivatives desk so far this year.

13.  The term "VIX" means Volatility Index, and is a measure of the expected price fluctuations in the S&P 500 Index options over the next 30 days.

14.  The Article represents a vicious and libelous smear, created in part by defendants BI and Morell, and in part by John Does 1-5, anonymous sources whose identities and motivations are presently unknown to plaintiff.

15.  Taken as a whole, the Article is false and defamatory in five respects.

16.  *First*, it states as a fact that plaintiff was fired "on the heels of the firm learning of a series of late-night tweets over the July 4th holiday weekend that were connected to the trader, two sources familiar with the matter told Insider."

17.  Plaintiff is "the trader" in the Article.

18.  In fact, plaintiff did not create nor was he previously aware of "a series of late-night tweets over the July 4th holiday weekend," or at any other time.

19.  *Second*, the article falsely states that plaintiff was discharged because of these alleged tweets.

20. In fact, plaintiff was not discharged for cause. The termination letter he received stated that the sole reason for his termination was that "[d]ue to changes in our business, our staffing needs have changed. As a result, your position will be eliminated and your employment with JP Morgan Chase & Co. and all of its affiliates (the "Firm") will terminate effective 9/3/2021 (your "Termination Date"). A copy of the letter is annexed as Exhibit B.

21. That fact alone demonstrates the falsity of the Article.

22. *Third*, the Article falsely states that plaintiff was discharged because he had violated JPMorgan's code of conduct.

23. In fact, plaintiff did not violate the code of conduct, because he did not do what the Article accused him of doing.

24. Very much to the contrary, he observed the code of conduct by refusing to make any substantive comment in response to the request from defendant Morell, since any comment could have reflected negatively on JPMorgan.

25. *Fourth*, it falsely states as a fact that plaintiff violated his fiduciary obligations to his employer. Given the large sums of money at stake in plaintiff's profession, such an accusation is destructive of his career, as it would be of that of anyone similarly situated and falsely accused.

26. In fact, plaintiff's post-discharge form U-5, which JPMorgan filed with FINRA, states no findings of any misconduct whatsoever. Were there any basis for such findings, JPMorgan would have been legally obliged to state them.

27. Thus the accusations regarding plaintiff's violation of JPMorgan's code of conduct in particular, or breach of his fiduciary obligations to it in general, are false and defamatory.

28. *Fifth*, the Article falsely states that plaintiff had been discharged as of the date of its publication. But he was not notified that he was being discharged until one week later.

29. Taken as a whole, the Article is false and defamatory, both *per se* and *per quod*, inasmuch as it accuses plaintiff of unprofessional conduct, and has caused him significant special damages.

30. It falsely states as a fact that plaintiff was discharged for cause, thus accusing him of wrongful and unethical conduct in his profession as a securities trader.

## PLAINTIFF'S REPUTATION AND CAREER HAVE BEEN SEVERELY DAMAGED BY THE ARTICLE,

31. Plaintiff has been severely damaged, both professionally and personally, by the false and defamatory statements in the Article.

32. A graduate of Northwestern University in 2009, plaintiff worked at Wells Fargo Securities as a trader for 4.5 years after graduation.

33. He was the youngest employee to be promoted there, at the age of 24. He was highly profitable there and left on good terms, to work at Thiel Capital (Peter Thiel's hedge fund).

34. He was let go, albeit on good terms, after 1.5 years, solely due to a drop in the value of his portfolio in August 2015.

35. From there plaintiff was hired by BNP to trade equity derivatives for them. His actions were highly profitable for them, and his annual compensation rose from $250,000 to $750,000 in only two years.

36. He then joined JPMorgan in April 2019, believing it be a better opportunity. His initial title was Vice President on its Equity Derivatives trading desk, responsible for trading the CBOE Volatility Index (VIX).

37. Despite the impact of the COVID-19 pandemic on his workplace, plaintiff consistently ranked high in his annual performance reviews.

38. Throughout 2020, plaintiff performed extraordinarily well, despite the serious risks to his health during the pandemic. He was the highest performing trader on his trading desk and the number one revenue producer. He generated over $215 million in trading revenues on behalf of JPMorgan; approximately 700% over his target revenues objective.

39. Based on his outstanding performance, in January 2021 JPMorgan promoted plaintiff to Executive Director, increased his base salary to $350,000, paid him a $1.15 million bonus and provided him with the highest rating (5) on his performance review.

40. All of that success and reputation has now been damaged, if not destroyed, by the Article.

41. Since being discharged by JPMorgan, plaintiff has been unable to secure another position in the securities industry.

42. Three confirmed employment offers he received were rescinded and withdrawn, solely because senior officials at those organizations (with whom plaintiff never interviewed) read the Article and directed that the offers be withdrawn, after plaintiff had accepted them.

43. Plaintiff had voluntarily disclosed the existence of the Article during each and every interview, and had been reassured initially during each and every one that it was not an obstacle.

44. But despite the enthusiasm with which he was offered these positions, when the offers were presented to senior officials for what is normally *pro forma* approval, they were rescinded.

45. At JPMorgan, plaintiff was making millions of dollars for them and himself, and had sterling performance reviews.

46. Now, he has no job and his prospects are grim, solely because of the Article's selfish, pointless and malicious takedown.

47. The continued availability of the Article, also pointless, is close to making him unemployable.

48. After being discharged from JPMorgan, plaintiff obtained another position with a securities firm, but was only able to do so because a close friend worked there, and vouched for his character. However, the position was not a good fit, and it lasted only three months.

49. Since leaving JPMorgan, plaintiff has received rejections from no less than *twelve* firms in the securities industry, all of which were either explicitly or implicitly because of the Article.

50. Of these rejections, seven occurred at the "gatekeeper" level, that is, from the persons responsible for business development. In fact, these firms initially approached plaintiff precisely because of his stellar track record and trading strategy, but he was never invited for an interview once he told them about the Article, as he felt ethically obliged to do.

51. For example, plaintiff received a written offer of employment from an international investment bank, at the firm's New York office.

52. The offer was approved by everyone responsible, from the person in charge of US equities to the head of global derivatives, and there was legal and compliance sign-off.

53. All of these persons were made aware of the Article and the circumstances of plaintiff's departure from JPMorgan.

54. But then an official in Paris, in charge of firm-wide conduct, cancelled the offer after reading the Article.

55. Plaintiff was told that hiring him was too big a reputational risk for the firm.

56. Before these rejections, plaintiff set performance records. In his two years at JPMorgan, he generated income for the firm of approximately $270 million.

57. Prior to the publication of the Article, plaintiff enjoyed a spotless reputation in his professional and personal life.

58.  Plaintiff is not a public figure whose profile should matter in the least to the defendants. He is just trying to practice his profession, pay his mortgage, and support his family.

59.  The defendants' actions have destroyed his ability to do so, and they should be held accountable for those actions.

60.  The defendants John Does 1-5 slandered plaintiff, and defendants Morell and BI wrote and published the libelous Article, in a grossly irresponsible manner, without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

61.  A responsible publisher would not have published a story about a private person based solely upon information from anonymous parties such as John Does 1-5.

62.  As a responsible writer and publisher, defendants BI and Morell were obliged to investigate the truth or falsity of those statements in the Article which were of and concerning plaintiff.

63.  This is especially so in the case of anonymous parties who were acting with motive to harm plaintiff.

64.  Moreover, defendants BI and Morell were well aware that plaintiff was unable to respond substantively to their requests for comment, because JPMorgan's policy strictly prohibited its employees from speaking directly to media organizations.

65. At no time were defendants BI and Morell under any deadline pressure to write, edit and publish the Article.

66. Defendants BI and Morell failed in their obligations to the truth, either because of conscious indifference or negligence, or because they deliberately chose to accept at face value everything which defendants John Does 1-5 may have told them during the course of writing, editing, and publishing the Article.

67. It is obvious from the tone of the Article that the anonymous sources, defendants John Does 1-5, were motivated by personal malice toward the plaintiff, and were therefore unreliable.

68. In addition, the fact that the Article stated that plaintiff had already been fired, when it did not actually happen until a week later, demonstrates the malicious and willful intent to damage plaintiff's career.

69. In other words, defendants John Does 1-5 must have known in advance that plaintiff would be fired, yet falsely stated that it had already occurred. And defendants BI and Morell believed them, causing plaintiff great harm.

## FIRST CAUSE OF ACTION
### (Libel *per se*)

70. Plaintiff re-alleges paragraphs 1 through 69.

71. The foregoing statements in the Article, taken both individually and as a whole, are false and defamatory *per se*, in that they accuse plaintiff of highly unprofessional actions, namely violations of company policy and breach of his fiduciary obligations to his employer.

72.  Plaintiff is entitled to a judicial declaration that the Article taken as a whole is false and defamatory, to an injunction requiring its permanent removal from the internet and elsewhere, and to compensatory and punitive damages in such sums as the Court and a jury may direct, but not less than $1 million each.

### SECOND CAUSE OF ACTION
### (Libel *per quod*; Special Damages)

73.  Plaintiff re-alleges paragraphs 1 through 69.

74.  Plaintiff has suffered special damages, in that the direct effect of the Article has been to prevent him from obtaining employment in his profession, since it appeared and until the present day, leading to his calculable financial loss.

75.  Plaintiff is entitled to a judicial declaration that the Article taken as a whole is false and defamatory, to an injunction requiring its permanent removal from the internet and elsewhere, and to compensatory and punitive damages in such sums as the Court and a jury may direct, but not less than $1 million each.

WHEREFORE, plaintiff demands relief as follows:

On each of his First and Second Causes of Action, a judgment declaring that the statements contained therein which are of and concerning plaintiff are false and defamatory, and awarding compensatory and punitive damages against defendants in such sums as may be awarded by a jury and the Court, but not less than $1,000,000 on each one;

Together with the costs and disbursements of this action, and such other relief as may be just, including reasonable counsel fees.

Dated: New York, New York
April 19, 2022

*/s/ Richard A. Altman*

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
150 East 56th Street, Suite 12B
New York, NY 10022
212.633.0123
altmanlaw@earthlink.net